UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BRAN CRUDDEN AND TRANSPARENT EQUITY ENTREPRENEURS, LLC<br><br>Defendants, | Case No.<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("the Commission") alleges the following against Bran Crudden and Transparent Equity Entrepreneurs, LLC ("Transparent Equity" and collectively, with Crudden, "Defendants"):

**SUMMARY OF THE ACTION**

1. Crudden, operating through his solely-owned and operated company Transparent Equity, made false and misleading statements and engaged in other deceptive conduct in connection with offering and selling investment interests in a day trading fund and several pre-IPO (initial public offering) funds.

2. From March 2021 through at least March 2026 (the "Relevant Period"), Crudden raised more than $645,000 from approximately 23 retail investors. In soliciting investments, Crudden publicly advertised his purported personal and professional success as a securities trader. He also touted the supposed current and historical performance of his day trading fund, claiming, for example, that it had outperformed the S&P 500 over a period of years. But Crudden lied to investors about, among other things, both his and the fund's track record, use of investor

money, and the content of certain pre-IPO investment opportunities. In truth, Crudden had a checkered employment history, he and Transparent Equity both regularly lost money trading, he used investor proceeds to pay for personal obligations and make Ponzi-like payments to certain investors using other investors' money, and Defendants had not acquired shares in certain pre-IPO companies as claimed.

3. Ultimately, Crudden's mismanagement and misuse of Transparent Equity investor funds resulted in significant losses (for example, in 2022 alone, his day trading fund lost 75% of its value, and he sustained significant losses of 30% in 2021 and 35% in 2023).

4. To hide the investor losses and to attempt to induce additional investments, Crudden misrepresented the performance of the funds by, for example, falsifying investor statements to reflect inflated account valuations and, when certain investors requested withdrawals, made Ponzi-like payments.

5. By committing the acts alleged in this Complaint, Crudden and Transparent Equity violated the antifraud provisions of the federal securities laws: Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder and Section 17(a) of the Securities Act of 1933 ("Securities Act").

6. There is a reasonable likelihood that, unless restrained and enjoined, Defendants will continue to violate these federal securities laws.

7. Accordingly, the Commission seeks: (a) injunctive relief; (b) disgorgement of ill-gotten gains; (c) pre-judgment interest on those ill-gotten gains; and (d) civil penalties.

## JURISDICTION AND VENUE

8. The Commission brings this action under Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

9. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa], and 28 U.S.C. § 1331.

10. Venue is proper in this District under Section 20 of the Securities Act [15 U.S.C. § 77t] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business constituting violations of the securities laws alleged in this Complaint occurred within this District. Specifically, during the Relevant Period, Crudden and Transparent Equity solicited investors and executed agreements with investors in this District. Further, Crudden resided in this District and operated Transparent Equity from his home office in this District.

11. The investments that Defendants offered and sold in the day trading and pre-IPO funds are securities because they are investment contracts under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

12. In connection with the conduct described in this Complaint, Defendants, directly or indirectly, made use of the mails or the means or instruments of transportation or communication in interstate commerce by, among other means, accepting investments from investors in various states, transmitting investor documents and correspondence via email, and accepting investor deposits via mail, wire, or other electronic-funds transfers.

13. Defendants' conduct has involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and has resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

14. **Bran Crudden**, age 38, is a resident of Columbia, Connecticut. Crudden has never held any securities licenses and he has never been registered with the Commission. Crudden is the founder of Transparent Equity and was its sole member and control person.

15. **Transparent Equity Entrepreneurs, LLC,** was a Connecticut limited liability company founded by Crudden in 2021, with its principal place of business in Columbia, Connecticut. Transparent Equity was administratively dissolved by the Secretary of State of Connecticut in November 2024, though it continued to do business until at least March 2026. Transparent Equity has never been registered with the Commission.

## STATEMENT OF FACTS

### A. Crudden's Background and Formation of Transparent Equity

16. From 2012 until April 2021, Crudden worked as a trader at several proprietary trading firms. A proprietary trading firm, commonly called a prop firm, is a financial company that uses its own capital to trade securities, rather than managing client funds.

17. Crudden's history at these firms was checkered. At one firm, Crudden was terminated in 55 days, after his account was in the negative for 85% of his trading days and ultimately accrued more than $61,000 in aggregate losses. At another firm, Crudden was terminated for reasons including inconsistent trading performance, not abiding by trading limits while in a deficit, and refusing to participate in a performance plan.

18. Crudden accepted his first investment for Transparent Equity in March 2021 and formally organized Transparent Equity as an entity on April 27, 2021. Transparent Equity's website, the content of which was either created or approved by Crudden, marketed it as a "unique investment fund that empowers ordinary people to invest alongside professional traders."

19. Through Transparent Equity, Crudden offered two categories of investment opportunities: (i) a day trading fund (the "Intraday Trading Fund") and (ii) various pre-IPO investment funds.

*Intraday Trading Fund*

20. The Intraday Trading Fund, solely managed by Crudden, was launched in March 2021 and became "fully operational" by December 2021. It pooled investor funds with Transparent Equity's capital, which came from Crudden, to engage in "short-term, intraday trading."

21. Investor returns were directly tied to the fund's financial performance, whether profit or loss.

22. Transparent Equity was authorized to retain up to 70% of the fund's monthly net profits as a management fee, which could be reduced or waived at Transparent Equity's discretion. In some instances, Crudden reduced or waived this fee.

23. Investors were purportedly allowed to withdraw their principal after one year, and principal plus interest after two years.

*Pre-IPO Funds*

24. For its pre-IPO funds, Transparent Equity purported to provide "investors access to shares in high-potential companies before they go public." Pre-IPO shares appeal to investors

because they can deliver high returns if the company's public offering share prices are higher than the cost of acquiring pre-IPO shares.

25. The Frequently Asked Questions (FAQ) section of Transparent Equity's website stated that the pre-IPO funds would obtain shares in the pre-IPO companies from "selling shareholders [who] are current and former employees, early investors, and advisors." The FAQ section further stated that the Transparent Equity investors would not directly own stock in the pre-IPO companies, but rather they would be "members of a fund (organized as an LLC) that purchase a specific company's shares or the economic interests in shares." Thus, Transparent Equity investors would not be acquiring actual shares in the pre-IPO company but would instead acquire a pro rata interest in an investment vehicle that itself held economic interests in the pre-IPO company.

26. Investor returns were directly tied to the change in value of the pre-IPO company shares held by the fund.

27. The FAQ section also stated that investors would be provided with formal "subscription documents indicating your membership in the fund."

28. Transparent Equity's use of investor documentation was haphazard, however. For example, some pre-IPO fund investors were provided with subscription documents signed by Crudden, which included limited partnership agreements ("LPAs"). The LPAs stated that the purpose of the partnership was for "investing in Securities" and that Transparent Equity was the General Partner with "exclusive management and control of the business of the Partnership."

29. Other investors invested in the funds without any signed formal documentation.

30. Regardless, investors understood that they were not obligated to do anything other than invest money, and that Crudden would exercise control and authority over the pre-IPO funds.

31. The investment interests in the Intraday Trading Fund and the pre-IPO funds offered and sold by the Defendants were investment contracts, a type of security defined in the Securities Act and the Exchange Act.

**B. Defendants Made False Statements About Crudden's Historical Trading Results and Transparent Equity's Investment Funds to Induce Investors to Invest.**

32. During the Relevant Period, Defendants raised more than $645,000 from approximately 23 retail investors in the Intraday Trading Fund and the pre-IPO funds.

33. In soliciting these investments, Defendants made material misrepresentations about Crudden's purported historical trading success and Transparent Equity's investment performance and holdings. These falsities appeared in marketing brochures, investor newsletters, and on Transparent Equity's website and social media accounts, and were made through informal communications such as in-person meetings and email messages.

34. Examples of specific misrepresentations include the following:

i. Crudden and Transparent Equity Made False Statements in a Marketing Brochure.

35. Transparent Equity's marketing brochure, prepared for potential investors, represented that Crudden had historically achieved "Superior Returns" with a "38% Average Annual Return 2014-2024" and a Sharpe Ratio—a metric intended to assess a trader's returns on a risk-adjusted basis, in which a ratio above 2.0 is generally considered to be excellent—of 3.34.

36. To bolster these claims, the brochure falsely stated that Crudden had "[o]nly 4 negative months in 12 years" and had significantly outperformed the S&P 500 over a period of years.

37. The brochure contained a chart comparing Crudden's historical annual performance to the historical performance of the S&P 500 from 2014 through 2023, falsely representing that his performance equaled or exceeded the performance of the S&P 500 in each of those years.

38. For example, the chart falsely represented that Crudden's trading had significantly outperformed the S&P 500 in 2021, 2022, and 2023. In reality, Crudden's actual trading performance in each of those years was in the negative. The bar chart below illustrates the difference between the S&P 500's return (yellow bar), the brochure's claimed performance (green bar), and Defendants' actual results (red bar).



ii. Crudden and Transparent Equity Made False Statements on the Website and in Emails.

39. Transparent Equity's website, which was public facing, contained January and February 2022 investor newsletters signed by Crudden claiming that the Intraday Trading Fund had achieved returns of 70% and 80%, respectively, since inception.

40. An email from Crudden to a potential investor on August 25, 2022, claimed that the Intraday Trading Fund "is currently up over 100% since we began in March 2021 and those numbers are expected to increase as the year continues!"

41. In reality, after experiencing positive returns in the first half of 2021, by December 2021 the Intraday Trading Fund's returns had been negative for five straight months, with cumulative realized losses (assets sold for a loss) of approximately $25,000 and unrealized losses (paper losses) of more than $70,000. Realized losses continued into 2022 and were almost $130,000 for the year.

42. In or around March 2021, Defendants began to advertise the opportunity to invest in pre-IPO funds for at least nine companies. Even though Defendants only ever actually obtained an investment interest in three of those companies, by February 2022, Defendants began to make false representations that they had acquired investment interests in additional companies.

43. For example, in the February 2022 investor newsletter available on its website, Transparent Equity claimed that it had acquired a significant number of shares in pre-IPO companies Pipe Technologies, Inc. and Cerebral, Inc., at discounted rates and offered investment interests in pre-IPO funds for both companies. This statement of ownership was false because neither Crudden nor Transparent Equity ever owned shares or economic interests in Pipe or Cerebral.

iii. Crudden and Transparent Equity Falsified a Stock Certificate.

44. In or around June 2025, a prospective institutional investor expressed an interest in investing in a Transparent Equity pre-IPO fund that Defendants claimed owned shares of Anduril Industries, Inc. In reality, neither Defendant had ever owned Anduril stock.

45. In connection with the solicitation, the potential investor requested confirmation that Transparent Equity actually owned Anduril stock. On July 10, 2025, Crudden's representative forwarded to the investor a June 25, 2025, email from Crudden containing copies of three forged stock certificates falsely representing that Transparent Equity owned a total of 554,367 shares of Anduril common stock.

46. In making the representations described above in paragraphs 35 to 45 Crudden intentionally or recklessly hid crucial facts regarding his checkered employment history, his and Transparent Equity's inconsistent trading results, and the content of certain pre-IPO funds. Concealing these important facts rendered Crudden and Transparent Equity's statements materially false and misleading.

**C. Defendants Concealed Investment Losses From Investors.**

47. Defendants mismanaged Transparent Equity investor funds, resulting in significant losses. To hide their mismanagement and investor losses, Crudden lied to certain investors about the value of their investments. Examples of specific lies include the following:

*Intraday Trading Fund*

48. During the Relevant Period, Crudden regularly commingled investor funds with his own money and deposited approximately $407,548 into brokerage accounts that he used for the Intraday Trading Fund. Approximately half of this money came from investors.

49. Under Crudden's sole management, the Intraday Trading Fund performed poorly. By July 2023, the brokerage accounts that comprised the Intraday Trading Fund held less than $1,400 total in equities and cash.

50. To conceal the Fund's trading losses under Crudden's mismanagement, Defendants furnished fabricated account statements to investors which falsely indicated that their investments were reaping substantial profits.

51. At times, the purported balances in individual investor statements were higher than the total value of the brokerage accounts making up the Intraday Trading Fund.

52. One account statement, for example, reflected that as of August 15, 2022, the investor had made a total profit exceeding 92% on an initial investment of $10,000, and that the investor's account balance was $19,210. In reality, at that time, the combined value of all assets in the brokerage accounts making up the Intraday Trading Fund was only $14,825.

53. Another account statement reflected that as of June 30, 2023, a different investor had made a total profit exceeding 62% on an initial investment of $5,000, and that the investor's account balance was $8,131.67. In reality, at that time, the combined value of all assets in the brokerage accounts making up the Intraday Trading Fund was only $1,192.24.

*Pre-IPO Funds*

54. Investment Firm A manages a portfolio of private limited partnerships (LPs) that invest in pre-IPO companies. In April 2021, Transparent Equity—funded by Crudden's personal money—invested a total of $400,000 in two of Investment Firm A's LPs: $200,000 allocated to the LP for pre-IPO company Dataminr, Inc., and $200,000 allocated to the LP for pre-IPO company Outreach Corporation.

55. At around the same time, Transparent Equity created two pre-IPO funds, one for Dataminr and the other for Outreach. Neither Transparent Equity nor Crudden ever owned a direct interest in Dataminr or Outreach stock, however. Instead, Crudden utilized his personal investment in Investment Company A's pre-IPO LPs as the underpinning for Transparent Equity's pre-IPO funds. As a result, the performances of Transparent Equity's Dataminr and Outreach pre-IPO funds were entirely dependent on the performances of the correlated Investment Firm A LPs.

56. From 2021-2025, at least nine investors invested a total of at least $107,300 across Transparent Equity's Dataminr and Outreach funds. Because of the manner in which Crudden structured these funds, he was effectively selling a portion of his personal investment interest in Transparent Equity's pre-IPO funds to his investors.

57. By November 2022, the value of Crudden's investment interests in Investment Firm A's Dataminr and Outreach LPs had decreased by 2.49% and 1.22%, respectively. Crudden subsequently requested that Investment Firm A allow him to withdraw his full investment in the Dataminr and Outreach LPs.

58. In December 2022, Investment Firm A made an exception to allow Crudden to withdraw $100,000 from Transparent Equity's investment in the Dataminr LP. In March 2025, after an arbitration on the matter, Crudden liquidated the remainder of Transparent Equity's investments in Investment Firm A, receiving a personal payment of $33,766.57 for Transparent Equity's Dataminr interest and $20,760.27 for Transparent Equity's Outreach interest. As a result, Transparent Equity's $200,000 investment in Investment Firm A's Dataminr fund lost $66,233.43, or 31.12%, and its $200,000 investment in the Outreach LP lost $179,240.73, or 89.62%.

59. Rather than returning the money to Transparent Equity to either be reinvested in Transparent Equity's Dataminr and Outreach funds, or returned proportionately to investors, Crudden—who was only entitled to retain a proportionate share of the money equal to his remaining interests in the Transparent Equity Dataminr and Outreach funds—retained all the funds in his personal bank account.

60. In August 2025, well after Crudden or Transparent Equity ceased to have any underlying investment interest in either pre-IPO company, Defendants provided statements to investors in Transparent Equity's Dataminr and Outreach funds falsely stating that their investments remained stable.

61. Transparent Equity's website continued to advertise investment opportunities in both Dataminr and Outreach until April 2026, when the website was taken offline.

**D. Crudden Misappropriated Investor Funds for Personal Purposes and Transparent Equity Made Ponzi-Like Payments.**

62. Crudden used investor funds for undisclosed personal purposes, and Transparent Equity made Ponzi-like payments to investors.

63. As an example, in December 2022, an investor provided Transparent Equity with $100,000 to invest in the Intraday Trading Fund. In emails to the investor, Crudden recommended that $50,000 of the investment be allocated to a trading account with Proprietary Trading Firm A to "create a nice steady inflow of returns you can count on coming in every month," as it was "the best way . . . to have significant, steady, immediate returns . . . ."

64. Proprietary Trading Firm A explicitly prohibited Crudden from trading with investor funds. To circumvent this prohibition, Crudden used the investor's $50,000 to open an account in Crudden's own name at Proprietary Trading Firm A.

65. Less than two weeks later, Crudden closed the account after losing 24.74% of the investor's deposited investment.

66. Crudden disclosed to the investor that he had withdrawn her funds from Proprietary Trading Firm A, but falsely stated that her money remained intact.

67. Instead of using her remaining investment for day trading, however, Crudden used $52,500 to pay a personal obligation and Defendants used $15,000 to make a Ponzi-like payment to another investor.

68. Crudden later sent the investor whose money he had misappropriated profit and loss statements falsely claiming that her full $100,000 had been invested in the Intraday Trading Fund and, in March 2025, he falsely told her the investment had increased to a value of $181,220.65.

69. From December 2022 to July 2026, Transparent Equity partially fulfilled at least 12 investors' withdrawal requests, for a total of approximately $100,496. Defendants had falsely represented to each of these investors that their investments had either profited or remained stable. In reality, however, each investor who received a disbursement had actually lost money. Moreover, the underlying investment funds that the investors understood were the source of their disbursements actually contained smaller balances than the misrepresented value of their investments. As a result, when Crudden and Transparent Equity disbursed funds, they did so by making Ponzi-like payments using money that belonged to other investors.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

70. The Commission repeats and incorporates by reference the allegations in paragraphs 1-69 of the Complaint as if set forth fully herein.

71. Defendants, in connection with the purchase and sale of securities, by the use of the means and instruments of interstate commerce, the mails, or any facility of any national securities exchange, directly or indirectly: (a) used and employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

72. Defendants knowingly or with severe recklessness made the material misrepresentations and omissions and engaged in the fraudulent conduct and/or scheme described above.

73. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

**SECOND CLAIM FOR RELIEF**

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

74. The Commission repeats and incorporates by reference the allegations in paragraphs 1-69 of the Complaint as if set forth fully herein.

75. By engaging in the conduct described above, Defendants, in the offer or sale of securities, by use of the means or instruments of interstate commerce or of the mails directly or indirectly have: (a) knowingly or severely recklessly employed devices, schemes or artifices to defraud; (b) knowingly or severely recklessly, or negligently, obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) knowingly or severely recklessly, or negligently, engaged in transactions,

practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers or prospective purchasers.

76. By reason of the foregoing, Defendants violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A. Enter a permanent injunction restraining defendants Crudden and Transparent Equity, as well as their agents, servants, employees, attorneys, and other persons in active concert or participation with them from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

B. Require Crudden and Transparent Equity to disgorge their ill-gotten gains, obtained as a result of the violations alleged herein, plus prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

C. Require Crudden to pay an appropriate civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws as alleged herein;

D. Enter a permanent injunction pursuant to Section 21(d)(5) of the Exchange Act restraining Crudden, as well as his officers, agents, servants, employees, attorneys, and other persons in active concert or participation with him, from, directly or indirectly, including, but not limited to, through any entity he owns or controls, participating in the issuance, purchase, offer,

or sale of any security to investors or potential investors; provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts;

E. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F. Award such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a jury trial in this action of all issues so triable under the claims in this Complaint.

Respectfully submitted,

/s/ *David H. London*

David H. London (CT PHV02133; Mass. Bar No. 638189)
Dawn Edick (Mass. Bar No. 641659)
Sean Fishkind (D. Conn. No. 209606;
Mass. Bar No. 707172)
Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
(617) 573-8997 (London direct)
(617) 573-4590 (fax)
LondonD@sec.gov (London email)

Dated: October 29, 2026